AMAX COAL COMPANY,
Plaintiff–Appellee,

v.

UNITED MINE WORKERS OF AMER-
ICA, INTERNATIONAL UNION; Dis-
trict 12, United Mine Workers of Amer-
ica; and Local 7031, United Mine
Workers·of America, Defendants–Appel-
lants.

No. 95–3288.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1996.

Decided Aug. 13, 1996.

Byron L. Myers, Kelly A. Evans, Ice, Mil-
ler, Donadio & Ryan, Indianapolis, IN, for
Plaintiff–Appellee.

Gail E. Mrozowski, Barbara J. Hillman,
Cornfield & Feldman, Chicago, IL, for De-
fendants–Appellants.

Before FLAUM, EASTERBROOK, and
DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Amax Coal Company ("Amax") filed this
action under Section 301 of the Labor Man-
agement Relations Act, 29 U.S.C. § 185,
seeking to vacate an arbitrator's decision that
Amax had violated a collective bargaining
agreement by the manner in which it rea-
ligned a certain unionized employee. The
local, district, and international divisions of
the United Mine Workers of America ("the
Union"), which represents the workers in the
Amax mine, filed a counterclaim in district
court seeking to enforce the arbitrator's
award, and both sides filed motions.for sum-
mary judgment. The district court granted
summary judgment for Amax, denied the
Union's motion for summary judgment, and
vacated the arbitrator's award. We affirm.

I.

The following facts are not in dispute and
are consistent with those found in the arbi-
trator's decision. Amax is in the coal mining
and processing business and has mines in
Illinois and Indiana, one of which is the Delta
Surface Mine in Illinois. The Union repre-
sents the approximately 138 hourly workers

at Amax's Delta Mine. Amax and the Union are signatories to a national collective bargaining agreement, the National Bituminous Coal Wage Agreement of 1988 and of 1993 ("the Agreement"), which governs the employees at the Delta Mine.[1]

The current dispute involves the staffing of the 3270 dragline at the Delta Mine. A dragline is a large stripping machine that removes surface materials, such as rock and dirt, which cover the coal, in order to access and remove the coal from the mine pit. The 3270 dragline at the Delta Mine is operated 7 days a week, 24 hours a day and has a bucket capacity of 172 cubic yards. Staffing of this dragline is governed by Article XXI, Section (b)(1)(iv) of the Agreement, which provides as follows: "Draglines and shovels 65 yards and larger in size shall be manned by an operator, an oiler and a groundman, and at least one additional Employee who shall be an operator, oiler, groundman, or a mechanic, electrician or welder."[2] Amax began operating the 3270 dragline at the Delta Mine in 1979, staffing the dragline with an operator, a groundman, and two oilers.

This arrangement was maintained until January of 1992, when a new manager from another mine was assigned to the Delta Mine. This manager brought knowledge of production efficiencies gained from his prior experience. One of the manager's ideas to increase efficiency involved replacing one of the oilers on the dragline crew with a welder. The change was intended to reduce the downtime resulting from dragline breakdowns. Prior to the 1992 change, whenever a welder was needed on the dragline, usually for repairs, Amax would have to call in a welder from the maintenance shop. It took approximately 30 minutes for a shop welder to arrive at the site of the dragline, at a cost to Amax of approximately $140 per minute in lost operating time (i.e., $4200 per breakdown). In addition, if a breakdown occurred during a time in which maintenance shop welders were not scheduled to work, a welder would have to be called in from home, resulting in even more substantial and costly delay. The change from oiler to welder at the fourth crew member position eliminated the need to wait for the shop welder to arrive, allowing necessary welding to commence immediately. The Union does not dispute the increased efficiency possible with this arrangement, nor Amax's good faith in making the adjustment for this reason.

Three junior oilers at the Delta Mine were affected by the change, one from each of the eight-hour shifts that operated the dragline. One of these oilers was able to qualify as a welder, however, and so did not lose his position. The other two oilers were unable to qualify as welders and were therefore replaced by welders on their crews. One of these oilers, Stephen Horton, was then "realigned" to a position as a shooter, according to the seniority provisions of the Agreement. The shooter position available to Horton had a lower rate of pay than his previous oiler position. Horton filed a grievance in January of 1992, asking that he be returned to his oiler position on the dragline crew and given the difference in pay between the oiler position and the shooter position for the time he was paid at the lower rate. When the Union and Amax were unable to resolve the dispute, it proceeded to binding arbitration in accordance with the terms of the Agreement. In the meantime, Horton remained in the shooter position until May 18, 1993, when he was able through his seniority to successfully bid for an oiler position at the higher rate of pay.[3]

Before turning to the arbitrator's decision, we note the following additional and potentially relevant provisions of the Agreement between Amax and the Union, the terms of which determine the outcome of this case. The Agreement contains the following management rights provision: "The management

---

1. The district court examined the relevant sections of both the 1988 and 1993 agreements and found them to be identical. Neither of the parties dispute this finding, and we have no reason to disturb it. Thus we will simply refer to "the Agreement" without distinguishing between the 1988 agreement and the one still in force.

2. The parties agree that this provision covers the staffing of the 3270 dragline.

3. Horton continues to seek lost wages and benefits for the period in which he was assigned to the shooter position.

of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer." Art. IA, Sect. (d). Article XVII of the Agreement is entitled "Seniority," and provides extensive rules for the filling of jobs and the implementation of seniority rights. It begins with a "Definition of Seniority" provision: "Seniority at the mine shall be recognized in the industry on the following basis: length of service and the ability to step into and perform the work of the job at the time the job is awarded." Art. XVII, Sect. (a). Thus present ability to do a given job is part of the definition of seniority under the Agreement.

The procedure for handling a realignment, such as the one that occurred in this case, is also established within the Article XVII provisions on seniority. The relevant provisions of the realignment section state as follows:

(2) Realignment Procedure

When the number of Employees within a job title is to be reduced or Employees are to be realigned, the following procedures shall apply:

(a) The senior Employees (mine seniority) in each job title shall be retained in their respective job title, regardless of shift or portal, up to the number needed in that job title.

. . . .

(b) Those employees displaced from their job title shall be assigned available jobs on the basis of mine seniority and ability to step in and perform the work of the job at the time, using the following procedure:

(i) The senior Employee in each instance shall be assigned to the job grade having the greatest standard daily wage rate and within which there is an available job. . . .

(ii) Assignment of job classifications and job titles within a job grade is within the exclusive discretion of the Employer. However, where there is more than one available job within that job grade, such assignments to the Employees to be assigned within that grade will be made on the basis of retaining in that grade the maximum number of employees being so assigned who have the ability to step in

and perform the available work at that time.

. . . .

(c) Any Employee who is not retained in his job title and who does not have the ability to perform an available job under the above procedure shall, to the extent his seniority permits, displace the least senior Employee at the mine holding a job which such senior Employee has the ability to step into and perform at that time. Any Employee displaced under this paragraph (c) shall have the same rights under this paragraph (c). Employees not retained under this procedure will be laid off.

Art. XVII, Sect. (b)(2).

## II.

The arbitration hearing between Amax and the Union occurred on July 19, 1994, before Arbitrator Thomas L. Hewitt ("the arbitrator"). The arbitrator issued his decision in a written opinion dated July 29, 1994. In his opinion the arbitrator specifically found that Amax was entitled to make the staffing change that it made, i.e., replacing an oiler position with a welder position on the dragline crew. He stated, "The arbitrator has no problem with the Company's right to change the job in this case. The use of a welder is obviously more efficient. . . ." And ultimately, he concluded as follows:

The arbitrator finds that the Company may replace the oiler classification with that of welder or add welder to the duties in order to improve efficiency. However, the incumbent employee on that bid job may not be displaced and suffer a pay loss as a result of the Company's unilateral job change. This violates the protected bid seniority rights of the incumbent. Therefore, to protect the employee's seniority and right to a permanent bid job, the incumbent employee shall first be given the opportunity to be tested for the new duty of welder. Failing such, he may request and be afforded reasonable training if he so desires. If he is unable to qualify through reasonable training or does not desire same, he shall, at the Company's discretion (1) be retained on the job (dur-

ing this time the employee will have an opportunity to bid to another position) or (2) be realigned to another job. If the job to which the employee is realigned is a lower pay grade, the employee shall retain his former pay grade until a status change (bid or realignment) modifies his pay grade status. The purpose is that the employee shall not suffer any loss as the result of the original displacement through maintaining the lost pay grade differential. This protection is normally called a red circle rate.

Since Horton had been unable to pass the welding test given him by Amax, the arbitrator ordered that he receive the same pay he received as an oiler until he could bid back to his oiler position.

Thus the arbitrator found that the company was indeed entitled, under Article XXI, Section (b)(1)(iv) of the Agreement, to change the fourth position on the dragline crew from oiler to welder and realign Horton accordingly. The arbitrator also found, however, that if the displaced oiler was unable to pass the welder's test, he was entitled to elect "reasonable training" for the position. And if after training he could not pass the test, or if he did not want the training, he was still guaranteed that his salary would not decrease, even if he was realigned to a position with a lower pay grade.

Early in his opinion, the arbitrator asserted that Horton's "job change was the result of the Company adding the welding requirement to the oiler position." He then noted that the employees in the newly created welder position on the dragline crew were only performing actual welding about 30 percent of the time, with the remainder of the time being spent doing the same things the second oiler had previously done. In this regard the arbitrator referred to "cases submitted by the Union" as supporting the proposition "that an employee's job may not be taken from him and given to other classifications if the majority of the duties of that job are still being performed." Later, however, the arbitrator stated that the change could be characterized *either* as "the elimination of the oiler job and adding the duties to a welder job or adding the welding job requirements to the oiler classification." And he

never actually found that the replacement of the oiler job with the welder job was improper under the Agreement, as interpreted in prior arbitration awards. In fact, as noted earlier, he made the opposite determination. The arbitrator emphasized the need to "balance ... the employee's bidding rights and the Company's right to determine the jobs and the work assigned to these jobs." He added that attrition, i.e., changing the fourth crew position from oiler to welder only when that position became vacant, would be a "proper method" of making the change desired by Amax.

The district court found that the arbitrator's award "failed to draw its essence" from the Agreement, making it illegitimate. The court emphasized that the arbitrator had expressly found that "the Company may replace the oiler classification with that of welder," and thus that Amax did not breach the Agreement when it replaced the second oiler position with that of welder. The district court determined that "an arbitrator cannot grant a remedy when he finds that there is no breach of the collective bargaining agreement." Consequently, the arbitrator had no authority to impose the training and red circle pay rate conditions on Amax. The court noted that although the arbitrator claimed to be balancing seniority rights against those granted Amax under Article XXI, Section (b)(1)(iv), he had no authority to engage in such balancing, since none was authorized or required by the Agreement. The court concluded that the arbitrator "was in reality imposing his own personal notion of justice and what he considered to be fair under the circumstances" and that he was not even arguably construing or applying the Agreement between Amax and the Union.

### III.

■ We review the district court's grant of summary judgment for Amax (and denial of summary judgment for the Union) *de novo*, applying the same standard to evaluate the arbitrator's decision as that employed by the district court. *Arch of Illinois v. District 12, United Mine Workers of America*, 85 F.3d 1289, 1292 (7th Cir.1996); *Jasper Cabinet Co. v. United Steelworkers of America,*

77 F.3d 1025, 1026 (7th Cir.1996). Summary judgment can be granted only if there is no genuine issue of material fact remaining and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Cases like this one, where the parties agree that there are no genuine issues of material fact in dispute and that the contested issues are purely legal ones, are especially appropriate for summary judgment.

■ It is well established that judicial review of arbitration awards under collective bargaining agreements is extremely narrow. *Arch of Illinois,* 85 F.3d at 1292; *Jasper Cabinet,* 77 F.3d at 1028. *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), represents the genesis of the modern era approach to judicial review of arbitration decisions. The Supreme Court emphasized in *Enterprise Wheel* that "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of awards." *Id.* at 596, 80 S.Ct. at 1360. Yet the Court confirmed that the power of arbitrators was not unlimited:

> Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361. This language remains the touchstone of our review of arbitration awards even today.

■ In order to further illuminate the meaning and import of this fundamental standard, courts have attempted to explain and apply it through various formulas. For example, this court has stated that

so long as the award is based on the arbitrator's interpretation—unsound though it may be—of the contract, it draws its essence from the contract.... It is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not to "draw its essence from the collective bargaining agreement"....

*Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 184–85 (7th Cir.1985) (emphasis in original) (internal citations omitted), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986); *see also Sullivan v. Lemoncello,* 36 F.3d 676, 683 (7th Cir.1994); *E.I. DuPont de Nemours and Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 614 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). The Supreme Court itself, in *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), read *Enterprise Wheel* as establishing that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." We have acknowledged that the central determination to be made is whether the arbitrator, who was delegated the power to interpret the agreement between the parties, has "exceeded the powers delegated him by the parties." *Arch of Illinois,* 85 F.3d at 1292; *Ethyl Corp.,* 768 F.2d at 184; *see also Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 935 F.2d 1501, 1505 (7th Cir.1991) ("Since the arbitrator's function, ordinarily and in this case, is limited to interpreting the contract, the court asked either to set aside or to enforce his award must make sure that he abided by that limit on his authority, for otherwise the award was made in violation of the agreement to arbitrate."); *Chameleon Dental Products, Inc. v. Jackson,* 925 F.2d 223, 225 (7th Cir.1991) ("[I]f we find that 'the arbitrator unmistakably went beyond the terms of the contract to reach the result set forth in his opinion,' we will set aside and vacate an arbitration award.") (internal citation omitted). Thus if the arbitrator can be said to be construing or

applying the agreement between the parties, we must uphold his award. Yet if there is "no possible interpretive route" to the arbitrator's award, we will refuse to enforce that award. *Arch of Illinois*, 85 F.3d at 1293; *Chicago Typographical*, 935 F.2d at 1506.

■ Although we recognize the very limited scope of the task of review before us, we agree with the finding of the district court that the arbitrator's decision cannot fairly be said to "draw its essence" from the Agreement. While the arbitrator was less than crystal clear on some issues, he explicitly stated that he had "no problem" with Amax's right to change the fourth dragline position from oiler to welder, noting the efficiency of this change. And in the conclusion to his opinion, the arbitrator again found that Amax "may replace the oiler classification with that of welder." While the Union attempts to construe the opinion as determining that this change was improper, we simply do not find this conclusion in the opinion, either explicitly or implicitly. Rather, like the district court, in attempting to make sense of the arbitrator's opinion (as it is our duty to do), we understand it as finding that *even though* Amax did not violate the Agreement in realigning Horton, it should have offered him training as a welder and continued paying him at the oiler rate, whatever job he ended up doing.

There are a number of problems with this seeming compromise that lead us to conclude that the arbitrator was not really "interpreting" the Agreement when he reached this result. First, we note that the Union acknowledges that *if* Amax was entitled to replace the oiler job with the welder job, Amax did follow the requirements of the Agreement's seniority provisions, particularly the section on realignment, in placing Horton in the shooter job. Since Horton could not

meet the requirements of the job title of "welder," and there were no other oiler positions that he could qualify for with his mine seniority, he was moved to the job that he could perform and for which his seniority made him eligible. Thus if Amax had the right to replace the oiler position with the welder position (a determination that we are convinced the arbitrator made), the Union should have no complaint about the district court's vacating of the award. As the district court found: there can be no remedy when there is no breach.

The Union maintains, however, that the arbitrator did find the job change to be in violation of the Agreement. The Union emphasizes the language in the arbitrator's opinion noting that new welders were only doing welding 30 percent of the time, with the rest of the time devoted to "oiler activities," and the finding that the change at Amax could be construed as simply adding the requirement of welding to the old oiler job. The arbitrator does refer to "cases submitted by the Union" (though he does not specify which cases) that support the idea that an employee in a certain job title cannot have his work taken from him and given to another job title if the majority of the job duties of the original job title have not changed. The arbitrator does not, however, ultimately conclude that the change at Amax was of this prohibited sort.[4] Not only does the opinion lack any language announcing such a finding, the ultimate decision of the arbitrator is entirely inconsistent with such a finding. If the arbitrator had determined that this case was governed by the arbitration cases submitted by the Union, he would have had to conclude that Amax's actions were invalid under the Agreement and then acted to vacate those actions by ordering that Horton be restored to his oiler job.[5] This

---

4. We note that it would seem rather wasteful if the Agreement were such that the only way that Amax could immediately implement the change from oiler to welder would be to insist that the welder avoid doing too many "oiler duties," presumably by avoiding productive activity in between welding opportunities.

5. It is worth noting that the cases submitted by the Union involved the creation of an entirely new job title, i.e., one that did not previously

exist at the mine. Yet the arbitrator explicitly acknowledged in his opinion that this was not such a case: "In this case, we do not have a new job class title and rate since first class welders' jobs [are] available at the mine site." Hence it appears that the arbitrator himself distinguished the line of cases cited by the Union. The arbitration cases submitted by both sides also appear very different from this one in that none of them involved a specific provision in the Agreement, namely Article XXI, Section (b)(1)(iv), explicitly

the arbitrator did not do. Rather, he concluded by explicitly approving the change, but insisting on certain training and compensation protections for the employee.

Such protections must have their origin in the Agreement in order to be valid. The arbitrator pointed to the seniority rights of the incumbent oilers as the source of these protections and spoke of "balancing" these rights with those of Amax to make the job change. Because it is the arbitrator's job, not ours, to construe the Agreement, we must insist on the enforcement of his decision if there is any possible interpretive path from the seniority provisions of the Agreement to the arbitrator's resolution of this case.[6] We are unable to find (or construct) such a path. Looking to the seniority provisions, we discover that the Agreement establishes, specifically and repeatedly, that seniority is based not only on length of service in the mine, but also on present ability to step in and perform the work of any desired job. Thus the parties have already *agreed*, as attested to clearly by their collectively-bargained Agreement, that time served alone provides no seniority rights whatsoever. If you cannot do the necessary work, you have no "seniority rights" with regard to that work. While the arbitrator is certainly responsible for harmonizing different aspects of the Agreement, he can only "balance" rights that actually arise under the Agreement.

The nature of the seniority "protections" devised by the arbitrator further pushes us to the conclusion that he was essentially imposing his own brand of industrial justice. The arbitrator provided employees like Horton with a right to be afforded "reasonable training" at the request of the affected employee. Yet the Agreement contains a section entitled "General Training Provisions," which applies to all training programs under the Agreement, *see* Art. XVI, Sect. (g), and which states as follows:

> The selection of Employees for training opportunities shall be in accordance with seniority and trainability. Definition of Trainability—trainability shall include a job-related determination of an Employee's ability to absorb the training to be provided, the mental and physical capacity to ultimately perform the job for which he is being trained. The job-related determination shall be based on objective standards which may be an oral, written or work demonstration of trainability for the specific job. . . .

Art. XVI, Sect. (g)(3). Thus the Agreement clearly establishes that *all* training opportunities are dependent upon a prior determination of "trainability." The training option required by the arbitrator is unconstrained by any such determination and therefore is inconsistent with the plain language of the Agreement itself. We are likewise unaware of any source within the Agreement—and none has been suggested by the Union—for the arbitrator's imposition of the "red circle rate." As the Supreme Court determined back in *Enterprise Wheel*, "When the arbitrator's words manifest an infidelity to [his] obligation [to interpret and apply the collective bargaining agreement], courts have no choice but to refuse enforcement of the award." 363 U.S. at 597, 80 S.Ct. at 1361.

Because the arbitrator cannot plausibly be said to have simply "interpreted" the Agreement, we conclude that he must have based his decision on factors external to the Agreement itself—and thus that he went beyond the authority delegated him by the parties. This conclusion leaves us no choice but to AFFIRM the district court's refusal to enforce the arbitrator's award and its grant of summary judgment for Amax.

---

authorizing the change instituted by the employer.

**6.** We would uphold the arbitrator's award if there was an interpretive path from *any* part of the Agreement, or the Agreement as a whole, to the arbitrator's award. The Union only points to the seniority provisions, however, and we have

found no other language in the Agreement that could lead to the training and pay protection obligations imposed by the arbitrator. We note that upon examining the entire Agreement, we did find some sections on training; yet none of these provisions was arguably applicable here. The general section on training, Article XVI, Section (g), is discussed in the text below.