Beatriz M. RODRIGUEZ, individually, and as Administrator of the Estate of Jose Rodriguez, Deceased, and Julian Ramon Rodriguez, a minor, by his mother and next of friend, Beatriz M. Rodriguez, Plaintiffs,

v.

The CITY OF MILWAUKEE, a municipal corporation and body politic, Defendant.

No. 95–C–1232.

United States District Court, E.D. Wisconsin.

March 7, 1997.

Brustin Law Offices by Marvin A. Brustin, Chicago, IL, for Plaintiffs.

Grant F. Langley, City Attorney, Jan A. Smokowicz, Asst. City Attorney, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

This action arises from the death of Jose Rodriguez on May 27, 1994, in Chicago. The plaintiffs claim that two allegedly intoxicated off-duty Milwaukee police officers, Gabriel Bedoya and John Koch, shot and killed Mr. Rodriguez. The plaintiffs filed this action against the city of Milwaukee ["the city"] on December 4, 1995, asserting claims under 42 U.S.C. § 1983 and under state law. The defendant's motion for summary judgment on both claims is presently before this court.

The plaintiffs contend that Mr. Bedoya and Mr. Koch were acting under color of state law on May 27, 1994, and that the defendant had a policy and practice of failing to evaluate its police officers for factors related to their continued employment, of failing to maintain proper supervision over department-issued firearms, and of requiring all police officers to carry a weapon at all times.

The plaintiffs also claim that the city negligently failed to monitor Mr. Bedoya's and Mr. Koch's activities and their ongoing ability to serve as police officers.

## I. UNDISPUTED FACTS

The following facts are taken from the parties' proposed findings of fact. Pursuant to Local Rule 6.05(d), the court will conclude that there is no genuine issue as to any material fact to which a specific response has not been set forth. *Hartley v. Wisconsin Bell, Inc.,* 930 F.Supp. 349, 354 (E.D.Wis. 1996); *see Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994).

Plaintiff Beatriz M. Rodriguez is a citizen of the state of Illinois and the widow of Jose Rodriguez, who was also an Illinois citizen. (Defendant's Proposed Findings of Fact ["DPFF"] ¶ 1). Ms. Rodriguez is the administrator of the estate of Jose Rodriguez. (DPFF ¶ 1). Plaintiff Julian Ramon Rodriguez is the only child born of the marriage of Beatriz and Jose Rodriguez. (DPFF ¶ 2). Julian Rodriguez is an Illinois citizen. (DPFF ¶ 1). The city is a municipal corporation existing under the laws of the state of Wisconsin. (DPFF ¶ 3).

For some time prior to May 27, 1994, the city employed Gabriel Bedoya and John Koch as police officers and had issued them both weapons and police identification. (DPFF ¶ 4). On May 26, 1994, Mr. Bedoya and Mr. Koch consumed large quantities of alcohol in Milwaukee. (DPFF ¶ 5). Armed with the weapons issued to them by the city and in possession of their police identification, they left Milwaukee and traveled to Chicago. (DPFF ¶ 5). At all times relevant to this action, Mr. Bedoya and Mr. Koch were each wearing a holster issued by the Milwaukee police department designed for off-duty use. (Plaintiffs' response to the defendant's motion for summary judgment ["Plaintiffs' response"], Ex. B, January 22, 1996, transcript of *State of Illinois v. Bedoya* ["Bedoya transcript"] at 52–56). During their trip, they continued to drink alcoholic beverages. (DPFF ¶ 5).

Upon arriving in Chicago, Mr. Bedoya and Mr. Koch went to Casanova's Bar, where they were served several more intoxicants. (DPFF ¶ 6). After leaving Casanova's Bar, Mr. Bedoya and Mr. Koch went to the Dynasty Club and Bar [the "club"] in Chicago. (DPFF ¶ 7). They were stopped at the front entrance of the club by Jose Rodriguez. (DPFF ¶ 7). Mr. Rodriguez was employed as a bouncer at the club. (Plaintiffs' response, Ex. A, Marin Dep. at 28–29). Mr. Rodriguez informed them that they could not enter the club with their weapons. (DPFF ¶ 9).

It was the policy of the club to search all of its customers for weapons upon entering the club. (Plaintiffs' response, Ex. A, Marin Dep. at 31, 101). It was also the policy of the club to permit police officers with proper identification who were on duty to enter the club with weapons, (Plaintiffs' response, Ex. A, Marin Dep. at 63–64), but not to permit off-duty police officers to bring their weapons into the club. (DPFF ¶ 10).

Mr. Bedoya and Mr. Koch told Mr. Rodriguez that they were police officers and that they were trying to find an unnamed individual. (DPFF ¶ 11). They told Mr. Rodriguez that the unnamed individual had the same physical characteristics as Mr. Rodriguez. (DPFF ¶ 12). The two Milwaukee police officers then asked to see Mr. Rodriguez's identification. (DPFF ¶ 13). Mr. Rodriguez asked whether they intended to arrest him. (DPFF ¶ 14). Mr. Bedoya and Mr. Koch then walked past Mr. Rodriguez into the club. (DPFF ¶ 15).

While they were at the club, Mr. Bedoya and Mr. Koch were served more liquor. (DPFF ¶ 16). Mr. Bedoya also told an off duty police officer that he was carrying a weapon. (Plaintiffs' response, Ex. B, Bedoya transcript at 103–04). They subsequently left the club and went to Mother's Bar, where they drank more liquor. (DPFF ¶ 17). Mr. Bedoya and Mr. Koch were allowed to enter Mother's Bar by showing their guns and badges. (Plaintiffs' response, Ex. B, Bedoya transcript at 56). After leaving Mother's Bar, Mr. Bedoya and Mr. Koch returned to the club. (DPFF ¶ 18).

As Mr. Bedoya pushed open the outermost door of the club to exit the club, he was

grabbed from behind on his left shoulder by Mr. Rodriguez. (Plaintiffs' response, Ex. B, Bedoya transcript at 71, 72). In grabbing Mr. Bedoya, Mr. Rodriguez said words to Mr. Bedoya to the effect of "police shit." (Plaintiffs' response, Ex. B, Bedoya transcript at 71, 134, 135). Mr. Bedoya and Mr. Koch became engaged in a verbal argument with Mr. Rodriguez which escalated into a physical altercation. (DPFF ¶ 19). Mr. Bedoya and Mr. Koch assaulted and battered Mr. Rodriguez. (DPFF ¶ 20). Mr. Bedoya drew his police issued firearm and, while Mr. Koch restrained Mr. Rodriguez, fatally shot Mr. Rodriguez. (DPFF ¶ 21).

Jeffrey Bialk is a captain in the city of Milwaukee police department and held that rank in May 1994. (Bialk aff. ¶ 1). With respect to the administration of the city of Milwaukee police department, the city is divided into seven geographic districts numbered 1 through 7. (Bialk aff. ¶ 2). Mr. Bialk is the commander of district 1, and he was such in May 1994. (Bialk aff. ¶¶ 2–3).

As the commander of district 1, Mr. Bialk is responsible for the supervision and direction of all police officers assigned to that district. (Bialk aff. ¶ 5). In May 1994, Mr. Bedoya and Mr. Koch were assigned to district 1 as police officers. (Bialk aff. ¶ 6). As a captain for the city of Milwaukee police department, Mr. Bialk was familiar with and had access to the time sheets for police officers under his supervision, including those of Mr. Bedoya and Mr. Koch. (Bialk aff. ¶ 7). Both Mr. Bedoya's and Mr. Koch's time sheets reflect that they had a scheduled regular day off on May 27, 1994. (Bialk aff. ¶¶ 8–9).

Mr. Bialk did not have the power to authorize police officers within his district to leave Wisconsin for any official duties as a city of Milwaukee police officer. (Bialk aff. ¶ 10). Mr. Bialk would need to obtain that authority or be made aware of such authorization by an officer or officers above him in the chain of command within the Milwaukee police department. (Bialk aff. ¶ 10). Mr. Bialk did have the authority to permit officers within his district to leave the city for official business elsewhere within Milwaukee county. (Bialk aff. ¶ 11).

At no time through May 27, 1994, did Mr. Bialk ever authorize either Mr. Bedoya or Mr. Koch to leave the territorial jurisdiction of the city on May 26 or May 27, 1994, for any official police business. (Bialk aff. ¶ 12). At no time through May 27, 1994, was Mr. Bialk ever advised by anyone that someone within the chain of command above him had ever authorized either Mr. Koch or Mr. Bedoya to leave the limits of the city for official police business outside of Wisconsin. (Bialk aff. ¶ 13).

Mr. Bialk is aware that the inspector in charge of the criminal investigation bureau or the assistant chief of police operations are the only command level officers authorized by the chief of police for the city to permit a city police officer to travel outside of the state of Wisconsin for the purposes of prisoner transfer. (Bialk aff. ¶ 14). In Mr. Bialk's experience as a captain of police, he has never become aware of an instance in which the inspector for the criminal investigation bureau has authorized police officers assigned to street patrol duty to travel to another state in order to effect a prisoner transfer. (Bialk aff. ¶ 15). In May 1994, both Mr. Bedoya and Mr. Koch were assigned to district 1 only as patrol officers and were not assigned to interstate prisoner transfer duties. (Bialk aff. ¶ 16).

In his capacity as a captain in the Milwaukee police department, Mr. Bialk is generally familiar with and has access to the rules and regulations of the city of Milwaukee police department. (Bialk aff. ¶ 17). Milwaukee police department rule 4, section 3, provides, in pertinent part, that "[m]embers shall also observe the laws and ordinances in effect in any other jurisdiction while within such jurisdiction." (Bialk aff. ¶ 20). Rule 4, section 5 provides that police officers "shall have regular hours assigned to them for active duty each day, and when not so employed they shall be considered 'off duty.'" (Bialk aff. ¶ 21).

Rule 4, section 3 of the general rules and regulations of the Milwaukee police department provides that "[m]embers of the police force shall, at all times within the boundaries of the City, preserve the public peace, pre-

vent crime, detect and arrest violators of the law, and protect life and property." (Bialk aff., Ex. 3). Rule 4, section 5 of those rules states that:

> Members of the police force shall, however, be always subject to duty although periodically relieved from the routine performance of it; are always subject to orders from proper authority; and to call from civilians and the fact that they may be technically "off duty" shall not be held as relieving them from the responsibility of taking required police action in any matter coming to their attention at any time. (Bialk aff., Ex. 3)

Section 7 of Rule 4 provides that:

> Members of the police force are required to discharge their duties with coolness and firmness, and in time of extreme peril they shall act together and assist and protect each other in the restoration of peace and order. Whoever shrinks from danger or responsibility shall be considered guilty of cowardice and gross neglect of duty, and unworthy of a place in the service.

(Plaintiffs' response, Additional Undisputed Issue of Material Fact, ¶ 3). Order no. 9490 of the Milwaukee police department, dated January 30, 1987, was effective in May 1994. (Bialk aff. ¶ 22). The order provides, in pertinent part, that "[a]ny officer who exercises his/her option to carry any firearm while off duty shall neither consume intoxicating beverages nor ingest other drug/chemical substances which tend to impair the control of one's conduct." (Bialk aff. ¶ 23).

The Milwaukee police department daily duty assignment report for the late shift for district 1 for the day of Thursday, May 26, 1994, states that Mr. Bedoya had that day off. (Bialk aff. ¶ 24). The duty assignment the late shift for Friday, May 27, 1994, states that both Mr. Bedoya and Mr. Koch had that day off. (Bialk aff. ¶ 25).

Upon being hired, all Milwaukee police officers undergo basic training. (Smokowicz aff., Attach. B at 9). During that training, copies of Wisconsin statutes relating to privilege in the use of force, self-defense and the defense of others as well as a copy of the Milwaukee police department rules and regulations are given to all police officers. (Smokowicz aff., Attach. B at 9).

Mr. Bedoya received his basic recruit training from February 17, 1992, through July 3, 1992. (Smokowicz aff., Attach. B at 9). Mr. Koch received his training from October 18, 1981, through March 12, 1982. (Smokowicz aff., Attach. B at 9). Mr. Bedoya and Mr. Koch each received a copy of the rules and regulation of the Milwaukee police department during their basic recruit training. (Smokowicz aff., Attach. B at 10). The Milwaukee police department has an internal affairs investigation division which is charged with the investigation of complaints against members and employees of the department. (Smokowicz aff., Attach. B at 10).

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Only disputes over facts that are outcome determinative under the applicable substantive law are considered to be material and will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir.1994). If the movant makes such a demonstration, the non-movant must go beyond the pleadings and set forth specific facts which show that there is a genuine issue for trial. Rule 56(e), Federal Rules of Civil Procedure; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In resolving the motion, the court must view the record, and any reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Griffin v. City of Milwaukee*, 74 F.3d 824, 826–27 (7th Cir.1996).

**1060**

Even if the court finds that there is no dispute over a genuine issue of material fact, the court must also "make the further finding that given the undisputed facts, summary judgment is proper as a matter of law." *Wienco, Inc. v. Katahn Assoc.*, 965 F.2d 565, 568 (7th Cir.1992); *see also Amax Coal Co. v. United Mine Workers*, 92 F.3d 571, 575 (7th Cir.1996) ("Cases like this one, where the parties agree that there are no genuine issues of material fact in dispute and that the contested issues are *purely legal ones*, are especially appropriate for summary judgment") (emphasis added); *Glass v. Dachel*, 2 F.3d 733, 739 (7th Cir.1993) (holding that the defendant's admission that there were no material issues of fact did not waive all legal arguments based on those facts that "[i]f the court concludes that the same undisputed facts entitle either party to relief, it can so state.").

### III. ANALYSIS

▮ A § 1983 suit can involve two distinct legal tests. First, a plaintiff who sues an individual for injury allegedly caused by that person must show that the individual was acting "under color of state law." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds by Monell v. Department of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Second, the plaintiff who seeks recovery from a municipality or other local government for the injury allegedly caused by the individual must show that the governmental body in question had an unconstitutional or illegal policy, practice, or custom. *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36.

The plaintiffs seek recovery only from the city of Milwaukee, not from Mr. Bedoya or Mr. Koch. A related case by these same plaintiffs against Messrs. Bedoya and Koch is pending in another court from which the city was dismissed for lack of personal jurisdiction. *Rodriguez v. City of Milwaukee*, 1995 WL 704760 (N.D.Ill. Nov. 29, 1995). The city, although it is the only defendant, makes arguments based on both of the tests described above. It contends that the plain-

tiffs' claims under 42 U.S.C. § 1983 should be dismissed because the two officers were not acting under color of state law at the time of the incident in question. The defendant also argues that the plaintiffs have failed to provide any evidence of unconstitutional or illegal policies, practices or customs by the city.

The court must therefore address two questions: whether it needs to consider the color of state law issue; and if the court does consider it, how its resolution affects the municipal liability issue. In *Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir.1990), the court held that although the individual actor did not act under color of state law, this finding did not mandate summary judgment on the plaintiff's municipal liability claim. The court said that for a municipality to be liable, the alleged unconstitutional policy *itself* must cause the constitutional violation: "[T]he municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983." *Id.*; *see also Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir.1990) (concluding that although neither the defendant city nor any of its employees actually caused the plaintiffs' injury, " 'a jury reasonably could conclude that the city's conduct was the moving force in bringing about the constitutional violation' ") (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting)).

*But see Van Ort v. Estate of Stanewich*, 92 F.3d 831, 836 (9th Cir.1996) (holding that because the individual police officer acted as a private citizen, the plaintiffs had "no constitutional right to be free from his deprivations of their constitutional rights"), *cert. denied*, —— U.S. ——, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997); *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994) (finding that since the individual actors were not acting under color of state law, the plaintiff could not state a claim against the city because neither of the actors "inflicted a constitutional injury").

▮ There are two possible readings of *Gibson v. City of Chicago*. The first would allow the court to ignore the question of whether the *individuals* were acting under

color of state law and go directly to the question of whether the city had an unconstitutional practice or policy. The second would allow the court to look at the color of state law issue, but not find it dispositive of the municipal liability issue.

I believe that the second approach is more appropriate. Not only have both parties already fully briefed the color of law question, but the facts that will be useful in the court's determination of whether there is a general factual dispute on the color of state law issue will also be helpful in deciding the municipal liability issue. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (holding that a jury's conclusion that the defendant police officer did not constitutionally harm the plaintiff mandated the dismissal of the § 1983 action against the city).

Thus, I will first address the parties' divergent claims as to whether Mr. Bedoya and Mr. Koch were acting under color of state law on May 27, 1994. I will then move to the arguments that the city of Milwaukee did or did not have any unconstitutional or illegal policies, practices, or customs. Finally, I will consider the defendant's contention that the city is immune from the plaintiffs' state law negligence claims.

### A. Under Color of State Law

The plaintiffs make several claims in their effort to show that officers Bedoya and Koch were acting under color of state law on May 26 and 27, 1994. They assert that the police department's rules and regulations mandate a finding that the officers were acting under color of state law when Mr. Bedoya shot Mr. Rodriguez. Specifically, the plaintiffs rely on Rule 4, section 5 of the general rules and regulations of the police department, which requires that officers "always be subject to duty" and adds that officers are not relieved "from the responsibility of taking required police action in any manner coming to their attention at any time." The plaintiffs also point to Rule 4, section 7, which declares that "[w]hoever shrinks from danger or responsibility shall be considered guilty of cowardice and gross neglect of duty, and unworthy of a place in the service."

The plaintiffs emphasize the facts that Mr. Bedoya and Mr. Koch carried police-issued weapons during their entire visit to Chicago, that Mother's Bar allowed them to enter with their weapons, that they told Mr. Rodriguez that they were police officers looking for a suspect, and that Mr. Bedoya identified himself as a police officer just before shooting Mr. Rodriguez.

The city argues that Mr. Bedoya and Mr. Koch's actions on May 27, 1994 were those of private citizens, not those taken under color of state law. It would be error, the city claims, to conclude that the police department regulations *require* the officers to exercise their police powers while the officers are outside of Wisconsin. The city also maintains that the actions of the two officers that night were not only unconnected to their function as police officers, but were done in spite of an Illinois law that forbids off-duty officers to carry concealed weapons and in spite of a Milwaukee police department order that prohibits off-duty police officers from carrying a weapon while consuming alcoholic beverages.

 It is undisputed that Mr. Bedoya and Mr. Koch were not on active duty on May 27, 1996, but that does not end the required analysis. "Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties." *Pickrel v. City of Springfield,* 45 F.3d 1115, 1118 (7th Cir. 1995); *see Greco v. Guss,* 775 F.2d 161, 168 (7th Cir.1985).

In its proposed findings of fact, the defendant states that Illinois law forbids off-duty police officers from carrying concealed weapons. The plaintiffs, though, assert that there is a genuine issue of material fact as to whether Mr. Bedoya and Mr. Koch were "peace officers" who are exempt from Illinois' otherwise general prohibition on carrying concealed firearms. *See* 38 *Ill.Comp. Stat.* 24–1(a)(4) (1996). The plaintiffs are incorrect, however, in their declaration that this is a question over which reasonable fact-

finders might differ, because whether a party falls within the purview of a statute is not a factual question. In my opinion, this "disputed issue of material fact," as it is coined by the plaintiffs, is actually an issue of law.

Furthermore, the cases that the plaintiffs .cite for the proposition that there is no "distinction between peace officers from the State of Illinois and those from neighboring states, whether on duty or off duty," actually hold that the persons who were charged under the Illinois concealed weapon statute, one an off-duty security officer and the other an off-duty auxiliary officer, *were not* "peace officers" within the meaning of the statute. *Evans v. Rewers,* 595 F.2d 372, 374 (7th Cir.1979) ("The plaintiff—off-duty, miles from the hospital, and carrying his personal hand gun—was not a police officer entitled to the statutory exemption."); *People v. Norwick,* 261 Ill.App.3d 257, 261, 199 Ill.Dec. 425, 428, 634 N.E.2d 25, 28 (Ill.App.Ct.1994) (holding that an auxiliary policeman failed to prove that he was vested with the powers of a "peace officer" at the time of his arrest and thus was not entitled to the exemption.). The court, however, does not need to decide this legal issue; a finding that Mr. Bedoya and Mr. Koch were or were not allowed to carry their concealed weapons in Illinois would not control my decision on the color of state law issue.

The plaintiffs do not specifically address any more of the defendant's proposed findings of fact, but in their response to the city's motion for summary judgment, the plaintiffs contend that there are disputed issues of material fact. They allege that there is a genuine issue of material fact about whether the city's regulations required its police officers to respond to dangerous situations, even if they were off duty or in another jurisdiction. Thus, the plaintiffs argue, if a factfinder did conclude that if the two officers were so required, they were acting under color of state law when Mr. Bedoya shot and killed Mr. Rodriguez.

The court of appeals for the seventh circuit previously addressed the language of the Milwaukee police department rules and regulations that are presently at issue. In *Davis v. Murphy,* the court found it dispositive that the individual police officers, although not on duty and not in uniform at the time of the act in question, were carrying their badges and guns and "were on duty under regulations of the Milwaukee Police Department 'to be always subject to duty....'" *Davis,* 559 F.2d 1098, 1101 (7th Cir.1977); *see also Pickrel,* 45 F.3d at 1119 (characterizing an ordinance that required police officers to act as officers all of time as an important factor in deciding a color of state law issue); *Revene v. Charles County Comm'r,* 882 F.2d 870, 873 (4th Cir. 1989) (finding that although the officer was not on active duty at the time of the act in question, a local ordinance required him always to be on duty, and thus he had "retain[ed] authority to conduct official police action"). The *Gibson* court distinguished the situation in *Davis:* "[In *Davis*] when the officers exited their car, they identified themselves as police officers, carried their guns and badges, and effectively were on duty pursuant to Milwaukee Police Department regulations that officers were 'to be always subject to duty.'" *Gibson,* 910 F.2d at 1518. In *Gibson,* the court explained that the officer "expressly had been ordered not to perform any police duties." *Id.*

However, the plaintiffs ignore a significant difference between the case at hand and *Davis*—namely that in *Davis,* the individuals' actions took place in Milwaukee and that the shooting in the present case took place in Chicago, Illinois. Rule 4, section 3 of the Milwaukee police department rules and regulations states that "members of the police force shall, *at all times within the boundaries* of the City, preserve the public peace, prevent crime, detect and arrest violators of the law, and protect life and property" (emphasis added). When this section is read in conjunction with Rule 4, section 5, it is apparent that no reasonable factfinder could conclude that the police department *compels* its officers to act like police outside of their own jurisdiction, although they may always be subject to duty within the city of Milwaukee. *Cf. Barna v. City of Perth Amboy,* 42 F.3d 809, 817 (3d Cir.1994) (describing the lack of evidence showing that the defendants' were not exercising actual police authority and including the fact that the officers were

acting outside of their jurisdiction); *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir.1976) (concluding that the individual could not have acted under color of state law because he was outside of his jurisdiction as a St. Louis police officer); *Firman v. Abreu*, 691 F.Supp. 811, 813 (S.D.N.Y.1988) (holding that the principle of acting under color of state law "can have no application, where, as here, the official has no colorable authority to act in the jurisdiction in which he purports to act").

■ I recognize that there are circumstances in which plaintiffs successfully sue police officers who were acting outside of their legal jurisdiction. Indeed, § 1983 allows recovery for injuries against individuals who acted outside of the scope of their legitimate authority. *See Barna*, 42 F.3d at 816 ("[O]ne who acts without actual authority but who purports to act according to official power, may also act under color of state law."). There are also situations in which a police officer acts under color of state law when he or she is in another jurisdiction. *See Rambo v. Daley*, 851 F.Supp. 1222, 1224–26 (N.D.Ill. 1994) (finding that the defendants did act under color of state law, although the alleged acts occurred outside of the officers' jurisdiction and the officers did not have actual authority).

Nevertheless, it is my opinion that no reasonable factfinder could determine that the Milwaukee police department *required* its officers to act as police at all times, in all jurisdictions. While the above-quoted language of the department's rules and regulations may be important when an individual officer commits an act within the jurisdiction, the explicit language in Rule 4, section 3 limiting the officers' duties to the boundaries of Milwaukee precludes the plaintiffs' reliance on this language.

The Rodriguez's also claim that there is a genuine issue of fact as to whether the two officers were performing police functions on May 26 and 27, 1994, especially when Mr. Bedoya shot Mr. Rodriguez. Much of the parties' disagreement stems from their identification of themselves as police officers that evening. The city argues that the officers' use of their police badges and their identification of themselves as police officers does not support the claim that Mr. Bedoya and Mr. Koch were acting under color of state law.

Whether the officers were "performing police functions" is essentially the same question as whether they were acting under color of state law. If the underlying facts are undisputed, the only question that remains is one that is a question of law; in which case, it is proper for the court to decide the matter on summary judgment.

■ Mr. Bedoya and Mr. Koch undoubtedly identified themselves as police officers while in Chicago on May 26 and 27, 1994. But, as the defendant has pointed out, "a mere assertion that one is a state officer does not necessarily mean that one acts under color of state law." *Gibson*, 910 F.2d at 1516. There must be more to support the plaintiffs' claim that Mr. Bedoya and Mr. Koch were acting under color of state law than that the individuals simply identified themselves as officers. The facts surrounding the circumstances in which the officers identified themselves as police are more important than the actual assertion itself.

■ It is more important to determine whether the two officers were clothed with the authority of the state when they identified themselves as police officers. According to the United States Supreme Court, the "traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The court of appeals for the seventh circuit, in finding that an individual actor did not act under color of state law, underscored the fact that the officer had been expressly ordered not to perform *any* police duties. *Gibson*, 910 F.2d at 1518. That court noted that "we have found no authority for expanding this concept of 'pretense' of law to encompass the actions of an official who possessed absolutely no

authority to act but nonetheless assumed the position of an imposter in pretending that he did" and that "[o]ne cannot misuse power that one no longer possesses." *Id.; see also Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989) ("[S]tate officials or employees who act *without the cloth* of state authority do not subject themselves to § 1983 suits."), *cert. denied,* 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990).

There is a distinct difference between the situation in *Gibson,* in which the officer had no authority to act at all, and other cases in which an individual acted outside of the scope of *legitimate* authority. For example, the court of appeals for the seventh circuit said, "Action taken by a state official who is cloaked with official power and who purports to be acting under color of official right is state action and is taken under color of state law whether or not the action is in fact *in excess of the authority actually delegated* to the official under state law." *Lopez v. Vanderwater,* 620 F.2d 1229, 1236 (7th Cir.) (emphasis added), *cert. denied,* 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980).

The line between an act that is done outside the scope of authority and an act that is done with no authority at all is often blurred. However, in the case at bar, the undisputed facts show that the actions of Mr. Bedoya and Mr. Koch fall into the latter category. This is not a situation in which an off-duty police officer nevertheless wore a uniform and explicitly told the plaintiff that she was under arrest, *see Pickrel,* 45 F.3d at 1117, in which the individual actors always retained authority to act while in their jurisdiction, *see Revene,* 882 F.2d at 873; *Davis,* 559 F.2d at 1101, or in which the officers, uniformed and in their marked police cars, crossed jurisdictional lines while following the plaintiff, *see Rambo v. Daley,* 851 F.Supp. at 1223.

 In my opinion, it is very clear that Mr. Bedoya and Mr. Koch did not have authority to act as police officers while in Illinois. In *Hughes v. Meyer,* the court, in finding that the defendant game warden did not act under color of state law, emphasized the fact that the defendant was not someone who could enforce the "full panoply" of state laws. The court went on to say that "[h]is

status as a DNR official did not clothe him with greater authority to make statements to the police about the occurrence than any other citizen would possess." *Hughes v. Meyer,* 880 F.2d 967, 972 (7th Cir.1989). Similarly, Mr. Bedoya and Mr. Koch's personal excursion into Illinois on May 26 and 27, 1994 was one in which they did not have the ability to act as police officers, despite their flashing of badges and Mr. Bedoya's use of a police-issued weapon. The undisputed facts show that the Milwaukee police department had authorized neither Mr. Bedoya nor Mr. Koch to leave the city for official police business. Furthermore, the provision of Wisconsin law that does allow police officers to act outside of their territorial jurisdiction in certain circumstances is limited to other jurisdictions *within* the state of Wisconsin. *Wis.Stat.* § 175.40(6)(a).

The fact that the officers had no authority to act in Illinois is not, however, completely dispositive. Another significant question is whether Mr. Bedoya and Mr. Koch, despite being in a jurisdiction in which they had no authority to act, so wielded their influence and power that they can be deemed to have been acting under color of state law. *See Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1944) ("[U]nder color of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded."); *Van Ort,* 92 F.3d at 838 (finding that the defendant could have been acting under color of state law if he had "used his 'government position to exert influence and physical control'" over the plaintiffs, "particularly if they were 'in awe of government officials'") (quoting *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476, 480 (9th Cir.1991)); *Greco v. Guss,* 775 F.2d 161, 167 (7th Cir. 1985) (noting that a constitutional violation can be under color of state law if "the authority of state officials puts the weight of the State behind the private decision."). Thus, if the two officers unduly exercised their influence to such an extent that they were *no longer* acting as private individuals, but as government officials, then they were acting under color of state law when Mr. Rodriguez was shot.

The requisite convincing facts simply are not present in this case. Mr. Bedoya and Mr. Koch were not only acting without any governmental authority, but instead were acting in furtherance of their own private and personal business. Any attempt that they made at using their status as police officers to influence or to put the weight of the government behind their actions was too feeble to turn their endeavors into ones that were taken under the color of state law. The two officers' mere identification of themselves as police officers and their conduct in Chicago fails to persuade this court that they had taken their personal drinking binge and turned it into a situation in which they held themselves out as police officers who were entitled to brandish all the power of the state.

Therefore, the court finds that, as a matter of law, Mr. Bedoya and Mr. Koch were not acting under color of state law when Mr. Rodriguez was shot and killed.

## B. Unconstitutional or Illegal Policy or Custom

The court now turns to the Rodriguezs' municipal liability claim. The plaintiffs allege that the city had a "custom, policy and practice" of not supervising properly its police officers or department-issued firearms, of not monitoring continuously its officers in order to determine their fitness to be police officers, of not exercising appropriate disciplinary procedures over the officers, of not keeping records of the officers' on- and off-duty activities, of not restricting the use of firearms by its police officers, and of requiring its officers to be always subject to duty. I addressed the last claim in the section above when I found that, as a matter of law, the city did not *require* its officers always to be subject to duty when the officers were not within Wisconsin.

Because the plaintiffs' remaining claims all assert that the city somehow *failed* to act, the court must examine them under the "deliberate indifference" standard set forth by the United States Supreme Court in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In that case, the Supreme Court rejected the argument that only unconstitutional policies themselves are actionable under § 1983 and found that a municipality's failure adequately to train police officers can also be actionable when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 387–88, 109 S.Ct. at 1204. The court of appeals for the seventh circuit has also applied the deliberate indifference standard to a "failure to select or implement necessary practices." *Harris v. City of Marion,* 79 F.3d 56, 58–59 (7th Cir.1996). The city's alleged inaction "must amount to deliberate indifference, so that it is fair to infer that the inaction is itself a 'policy.'" *Id.* at 59.

 The city's alleged failures to implement various procedures therefore amount to a policy or practice only if the plaintiffs show that the city was deliberately indifferent to others' constitutional rights; this is a standard that the court of appeals has called "elusive," *see Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir.1993), and "stringent," *see Graham v. Sauk Prairie Police Comm'n,* 915 F.2d 1085, 1100 (7th Cir.1990). A single incident is ordinarily not enough to prove that a municipality, through inaction, has an unconstitutional policy or practice. Justice Rehnquist, in a pre-*City of Canton* plurality opinion, said:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion) (footnotes omitted); *see Calusinski v. Kruger,* 24 F.3d 931, 936 (7th Cir.1994) ("A plaintiff must show that the municipal policy or custom and us-

age proximately caused the alleged unconstitutional conduct, and this usually requires more than a single incident of unconstitutional conduct.").

There is a good explanation for why a single incident is not enough to show that a municipality, by failing to act or by failing to execute a program, engaged in unconstitutional conduct: if the incident is the first of its, or a similar, type, it would be unjust to hold the city liable when the city had no notice that its procedures were inadequate. The court of appeals recently followed this reasoning when it said that "the plaintiff generally must allege a pattern or series of incidents of unconstitutional conduct or a clear constitutional duty to take action because the situation was certain to recur" and that "the plaintiff must support these allegations under Fed.R.Civ.P. 56(e) to withstand summary judgment." *Harris v. City of Marion,* 79 F.3d 56, 58–59 (7th Cir.1996). Similarly, the same court found that in order to meet the deliberate indifference standard, the plaintiff had "to show that the defendants were on notice of a pattern of constitutional violations resulting from the inadequate training of the police and jail personnel" and that this notice would have "to show that the failure to provide further training was tantamount to a deliberate or conscious decision on the part of the defendants to allow the violations." *Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir.1994).

■ Moreover, a plaintiff will not be able to withstand a motion for summary judgment with a mere allegation that similar incidents have occurred and that the defendant was aware of those incidents. While a § 1983 plaintiff is not subjected to a heightened pleading standard, *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), he or she, in order to survive the defendant's summary judgment motion, must still comply with Rule 56(e), Federal Rules of Civil Procedure, which requires that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the ad-

verse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In *Smith v. City of Joliet,* 965 F.2d 235, 237 (7th Cir.1992), for example, the court of appeals for the seventh circuit said that "in order to clear the summary judgment hurdle," the plaintiff had to present "sufficient evidence to allow a jury to conclude that some City policy or inadequate training caused the two officers to use excessive force" and that the plaintiff's evidence was "woefully inadequate." *See Holmes v. Sheahan,* 930 F.2d 1196, 1202 (7th Cir.) (finding that in order to show deliberate indifference, the plaintiff had to show there were "gross and systemic deficiencies" in the defendants' procedures), *cert. denied,* 502 U.S. 960, 112 S.Ct. 423, 116 L.Ed.2d 443 (1991); *Sims v. Mulcahy,* 902 F.2d 524, 543 (7th Cir.1990) ("[T]he quantum of evidence needed is considerably greater where, as here, the particular customs that appellants claim resulted in their injuries involve a course of municipal inaction that is a good deal removed from the constitutional deprivation alleged."), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).

■ Even if the plaintiffs do show that the city was deliberately indifferent to Jose Rodriguez's constitutional rights, they must still show a direct causal link between that "policy" and the constitutional deprivation. *Tapia v. City of Greenwood,* 965 F.2d 336, 338 (7th Cir.1992). Indeed, the policy must be the "moving force" behind the constitutional violation. *Monell v. New York City Dep't of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Cornfield by Lewis v. Consolidated High Sch., Dist. No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993); *Holmes v. Sheahan,* 930 F.2d 1196, 1199 (7th Cir.1991).

■ Despite the plaintiffs' assertion that the police department's failure to supervise or train its officers amounts to a policy or practice, they offer no evidence of similar

incidents other than their bald assertion that such "incidents occurred over a longstanding duration and with such widespread frequency that the Defendant City knew, or should have known, that it needed to implement guidelines or training programs designed to minimize those occurrences." (Plaintiffs' Response to Defendant's Motion for Summary Judgment p. 12). In their response to the defendant's motion, the plaintiffs argued that the court should not resolve the motion for summary judgment until it first resolved the plaintiffs' motion to compel discovery. The Rodriguezs' asserted that because the city had not responded completely to the interrogatories, they were "not in a position to respond to the Defendant's argument that no policy, custom or practice exists." More than four months have now passed since the court ruled on the plaintiffs' motion to compel and ordered the defendant to respond to certain interrogatories, yet the plaintiffs have not presented any evidence to support their allegations.

By failing to show that the city was on notice that Mr. Bedoya and Mr. Koch were dangerous and should not have been allowed to carry police-issued firearms, the plaintiffs have not met their burden of showing that the city was deliberately indifferent to Mr. Rodriguez's constitutional rights. Summary judgment in favor of the defendant is therefore proper on the plaintiffs' § 1983 claim.

### C. Pendent State Law Claim

The only remaining count against the city is the plaintiff's state law claim that the city was negligent in its hiring, entrustment, and retention of Mr. Bedoya and Mr. Koch. This court's jurisdiction over that count was supplemental, pursuant to 28 U.S.C. § 1367, which allows district courts to hear "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." The statute, however, also give the court discretion to decline to exercise supplemental jurisdiction over the state claims when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). That is the situation in the present case, and I will relinquish jurisdiction over the supplemental claim. *See Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.1997).

Therefore, IT IS ORDERED that the city of Milwaukee's motion for summary judgment be and hereby is granted in part and dismissed as moot in part.

IT IS ALSO ORDERED that the clerk of court be and hereby is directed enter summary judgment in favor of the city of Milwaukee and against the plaintiffs dismissing the plaintiffs' claim under 42 U.S.C. § 1983, with costs.

IT IS FURTHER ORDERED that the plaintiffs' state law negligence claim against the city of Milwaukee be and hereby is dismissed, pursuant to 28 U.S.C. § 1367(c)(2).

IT IS FURTHER ORDERED that the city of Milwaukee's motion for summary judgment on the plaintiffs' state law negligence claim be and hereby is dismissed as moot.